DAVID B. EZRA, ESQ. (SBN 149779)
dezra@bergerkahn.com
STEVEN A. EHRLICH, ESQ. (SBN 70742)
sehrlich@bergerkahn.com
CRAIG KLINE, ESQ. (SBN 86252)
ckline@bergerkahn.com
HEATHER WHITMORE, ESQ. (SBN 198300)
hwhitmore@bergerkahn.com
BERGER KAHN, A LAW CORPORATION
1 Spectrum Pointe Drive, Suite 340
Lake Forest, CA 92630
Tel: (949) 614-0100 • Fax: (949) 771-1922

Attorneys for Plaintiff Tokio Marine Specialty Insurance Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| TOKIO MARINE SPECIALTY INSURANCE COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALLIED WORLD NATIONAL ASSURANCE COMPANY, a New Hampshire corporation, and DOES 1 through 5, inclusive,<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR DAMAGES

Plaintiff Tokio Marine Specialty Insurance Company ("Tokio Marine") is informed and believes, and alleges as follows:

## INTRODUCTION

1. This complaint is based on the wrongful conduct of Defendant Allied World that injured Tokio Marine, while these two insurers (and other liability insurers) were involved in handling a serious personal injury claim that was litigated in Orange County Superior Court: Case No. 30-2023-01364568-CU-PO-CJC -- *Bernal v. DJM Capital Partners, Inc., et al*.

## The Parties

2. Plaintiff Tokio Marine Specialty Insurance ("Tokio Marine") is a Delaware corporation doing business in the state of California.

3. Defendant Allied World National Assurance Company ("Allied World") is a New Hampshire corporation doing business in California.

## Jurisdiction And Venue

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 (diversity jurisdiction) because this case arises between parties who are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

6. DOES 1 through 5 are sued under fictitious names because their identities are not yet known. Does 1 through 5 are in some way responsible for Allied World's misconduct or the mishandling of claims under the insurance policies covering La Habra Associates, LLC. This complaint will be amended to add the actual names of Does 1 through 5 as their identities are ascertained.

## FACTUAL ALLEGATIONS

7. This is a suit for equitable subrogation, tortious breach of insurance contract (bad faith), and related causes of action brought by one insurance

Berger Kahn
*A Law Corporation*

2

company, Tokio Marine, against another insurer, Allied World, based on conduct occurring while both insurers were involved in resolving a serious personal injury claim that was litigated in Orange County Superior Court. The case underlying this action, *Bernal v. DJM Capital Partners, Inc., et al.*, Case No. 30-2023-01364568-CU-PO-CJC, involved a claim by a pedestrian who was hit by an inattentive driver while on the grounds of the La Habra Marketplace shopping center located in La Habra, California.

8.     After her accident in August 2022, Marta Bernal filed suit seeking a multi-million dollar recovery for her injuries against multiple defendants: (1) the driver who hit her, Janelle Figueroa ("Figueroa"); (2) the store she walked out of immediately before she was hit, Ross Dress for Less, Inc. ("Ross"); (3) the property management firm overseeing the operation of the shopping center, DJM Capital Partners, Inc. ("DJM"); and (4) the shopping center property owner, La Habra Associates, LLC ("La Habra"). For the purposes of this complaint, defendants Ross, DJM and La Habra are sometimes referred to, collectively, as the "shopping center defendants."

9.     Plaintiff Tokio Marine and Defendant Allied World were two of the six insurers involved in resolving the *Bernal* litigation on behalf of the shopping center defendants.  The liability insurance tower covering La Habra included the following:

| INSURER | ATTACHMENT POINT | POLICY LIMIT |
|---|---|---|
| SOMPO | $38,000,000 | $12,500,000 |
| EVEREST | $26,000,000 | $12,000,000 |
| TOKIO MARINE | $16,000,000 | $10,000,000 |
| ALLIED WORLD | $6,000,000 | $10,000,000 |
| ASCOT | $1,000,000 | $5,000,000 |
| COLONY | $0 | $1,000,000 |

3

COMPLAINT FOR DAMAGES

Berger Kahn
*A Law Corporation*

10. The insurance tower represents the order in which the various policies and their limits could be invoked and made available to the shopping center defendants for the purpose of satisfying a damages award and/or settling Bernal's claim, starting at the bottom (primary) level. The coverage amounts represent the maximum amount a given insurer would contribute to a damages award or settlement offer, before the next level insurer's responsibilities kicked in. When seeking coverage amounts in order to effect settlement, the insured must start at the bottom of the tower and proceed upward. For example, defendants could access the limits of the $5M Ascot Policy—second in the tower—only after they had exhausted the limits of the $1M Colony policy—first in the tower—and so on up the line.

11. Because Plaintiff Tokio Marine is fourth in the tower, its policy limits of $10M would be unavailable to the shopping center defendants until Allied World's (third in the tower) $10M policy limits were exhausted.

12. The *Bernal* case was filed in 2023. Colony, the lowest level insurer in the tower, ultimately retained Alex Giannetto of Bremer Whyte Brown & O'Meara, LLP, to represent La Habra and Ross, to try the case if it did not settle. The parties engaged in discovery and motion practice throughout 2023, 2024, and 2025. Trial was set for November 17, 2025. By October 2025, serious settlement discussions were taking place.

13. Allied World's handling of the case, as the third insurer in the tower—particularly its conduct between October 31, 2025, and November 15, 2025—was unreasonable, negligent, and in bad faith. It impaired the entire tower's ability to defend the *Bernal* lawsuit, and it caused the *Bernal* case to settle for far more than it would have settled for if Allied World's conduct had been reasonable and not in bad faith.

COMPLAINT FOR DAMAGES

**Mid-October to November 15, 2025**

14.     Up until mid-October of 2025, La Habra, Ross, DJM, defense counsel, and the entire insurance tower were united in their view of the case and had long since agreed on a planned trial strategy.  In the *Bernal* shopping center defendants' view, the conditions of the shopping center and its parking lot were not the cause of the accident.  Rather, the defense uniformly agreed that fault rested with the distracted driver, Figueroa, who had been caught on video looking down at her radio when she drove her vehicle into Bernal.

15.     While the shopping center defendants agreed that fault lay with Figueroa, they understood that Bernal's attorneys intended to argue that the layout of the shopping center was also a cause of the accident.  Of course, the defendants recognized the possibility that a jury could find for Bernal and hold them liable as a "deep pocket" in order to compensate Bernal for her serious injuries.  As the case approached trial, there were risks in each direction and the prevailing view on both sides of the case seemed to be that a reasonable settlement would be preferable, as compared to the risks of trial.

16.     On or around October 24, 2025, Bernal's attorneys presented plaintiff's $22,000,000 life care plan, designed to cover plaintiff's need for ongoing medical treatment and 24-hour care for the rest of her life.  This plan raised the projected settlement range up to as much as $20,000,000, implicating the full amount of Allied World's policy limit.

17.     A mediation occurred on October 31, 2025.  Allied World did not have an adjuster meaningfully participate (electing, instead, to abruptly terminate participation due to purported childcare obligations, and instead rely on an outside coverage attorney who had no settlement authority).  Allied World offered no money toward settlement.  Although both Colony and Ascot made their full policy limits available, Allied World refused to make any part of its $10,000,000 policy limit available for settlement purposes.

COMPLAINT FOR DAMAGES

**Allied World "Hijacks" Defense of the *Bernal* Case**

18.    Instead of making its limits available and getting the case settled on October 31, 2025, Allied World held its policy limits hostage so that it could hijack, and ultimately, torpedo the defense of the *Bernal* lawsuit.

19.    With Allied World's intransigence having stymied settlement discussions, the litigation resumed.  On November 5, 2025, La Habra's "person most qualified" was deposed.  Although that deposition would not have taken place if Allied World had acted in good faith and been ready to negotiate in October, some of the deposition testimony caused the plaintiff attorneys to focus entirely on La Habra.

20.    On November 10, 2025, Bernal dismissed defendants Ross and DJM with prejudice, leaving La Habra as the sole deep pocket defendant.  This was itself another blow to the defense, because attorney Grant Waterkotte (of the Waterkotte, Mullis, Moreno, Garles law firm) was an experienced trial attorney who had been preparing to co-try the case along with Alex Giannetto.

**November 12: Allied Drops a Bomb on the Defense**

21.    On November 12, 2025 -- five days before trial -- in an all-carrier conference call, Allied World, via its claims adjuster Caroline Freilich, announced a drastic change in strategy.  Ms. Freilich's November 13, 2025 email, following up on the call, articulated the strategy change this way:

> Hi all, we are working around the clock to get this claim in the best position possible for settlement negotiations and/or trial.  Right now, the plan is to ask for a continuance, if a continuance is not granted, which I believe it will be given the state of discovery etc, we will revisit whether new counsel will take over the case.   If a continuance is granted, we will revisit trial strategy with defense counsel of record.  We will have these answers tomorrow on this aspect of the case.

COMPLAINT FOR DAMAGES

Berger Kahn
*A Law Corporation*

> We are also in the process of discussing settlement with plaintiff's counsel and we will keep you apprised of same.  Given the time constraints we are under and that landscape/valuation being assigned to this claim has changed in the past three days, this involves a lot of internal discussions/meeting/conference calls.
>
> I would appreciate if the carriers remained patient.

22.    With insurers Colony's and Ascott's limits already on the table, Allied World's abrupt change of tactics was an enormous gamble.  With the objective of trying to shift its responsibility to Ross and avoid paying all or part of its $10,000,000 policy limit, Allied World was gambling that it could both obtain a trial continuance and somehow pressure the recently dismissed Ross into voluntarily paying Allied World's share of a settlement.  This "strategy" was factually and legally unsound.  And it placed great risk on La Habra and the upper levels of the tower.  Specifically, Allied said it would now take control of the defense Colony had been funding and seek to blame the already dismissed defendant Ross for the accident.

23.    Allied World "reasoned" that if Ross could be implicated, Ross's insurer might be forced to step in and contribute to a settlement.  However, Ross's insurance was not a factor in the case.  After all, the accident occurred in a common area outside of Ross's control, and La Habra's lease required it to indemnify its tenant, Ross, for liability arising from events occurring in the common areas.  For this reason, the same law firm that was defending La Habra had been defending Ross.

24.    La Habra was forced to retain and pay counsel to try to rescue the defense and settlement and to compel Allied World to pay the policy benefits it was

7

COMPLAINT FOR DAMAGES

now willfully withholding. Allied World nevertheless sought to re-insert Ross into the case by conflicting La Habra's defense attorney off the case just 5 days before the trial started. Allied World hoped that by dropping this proverbial bomb on the defense and replacing the Bremer firm with a new attorney of Allied World's choosing (Charles Meyer of Burger, Meyer & D'Angelo), the trial judge could be convinced to continue a trial the judge had previously indicated would not be continued. This was an enormous gamble that stood to possible benefit Allied World, at every other stakeholder's expense.

25. Assuming that any amount Ross contributed would be used before Allied World's $10M was tapped, Allied World hoped to manipulate the defense attorneys (and the trial court) into creating a situation where Allied World would be able to avoid or reduce its own responsibility by delaying the trial and threatening to pin liability on Ross.

26. If it worked, Allied World hoped that this strategy would save Allied World some, and possibly all, of its $10,000,000 policy limit. But the "strategy" was incredibly risky. Because Allied World was considering only its own interests however, and consciously disregarding La Habra's interests and the interests of Tokio Marine and other upper level tower insurers, Allied saw itself as playing a hand where it could only win or draw.

27. If the strategy failed; if the court refused to continue the trial and if Ross continued to correctly assert that La Habra was obligated to indemnify Ross, Allied would put its tail between its legs and pay the $10,000,000 policy limit it should have paid to settle the case for $16,000,000 in October. There was no downside risk to Allied World. All the risk Allied World created would fall on La Habra and the upper level tower insurers.

28. If Ross did not fold or if the court did not fall for Allied World's 11th hour shenanigans, La Habra's new attorney would be starting trial after being involved in the defense of the case for all of about four days (two of which were

COMPLAINT FOR DAMAGES

Saturday and Sunday). And the new defense attorney's defense objective, as unilaterally ordered by Allied World, would be to argue that the shopping center was dangerous for pedestrians, that Ross somehow knew that, that Ross was obligated to disclose the perceived danger to La Habra, but that Ross failed to do so.

29. This would create a situation where the settlement value of the case would significantly escalate from the previous $16 to $20 million range, into the $25 million plus range.

30. According to adjuster Caroline Freilich, Allied World's new position relied almost entirely on its incorrect interpretation of the lease agreement between La Habra and its tenant, Ross. The provision at issue merely asked Ross to advise La Habra when an accident occurred in the common area, so that La Habra had notice of the possibility it would be called upon to indemnify Ross for liability resulting from that accident.

31. Allied World, however, interpreted the notice provision as conditioning its indemnification obligation on Ross's behavior. Specifically, Allied World claimed it did not owe Ross indemnification *unless* Ross had timely reported to La Habra any and all potentially dangerous conditions that ever existed in the common area, even if no accidents had resulted from those allegedly undisclosed conditions. Because Ross allegedly knew that some drivers sped through the parking lot on occasion—albeit without causing accidents—and Ross did not report that driver behavior to La Habra, Ross had forfeited its right to indemnification from La Habra (in Allied World's new view).

32. Through Freilich, Allied World announced its intention to bet the case on an incorrect lease interpretation. In Allied World's flawed logic, even though Ross had been dismissed and was not a party, once La Habra proved Ross's knowledge of (and failure to report) common area *speeding* by drivers who had *not* caused accidents, a jury would find that Ross was the cause of the injuries to Bernal. Allied World erroneously believed that La Habra would be relieved of its

COMPLAINT FOR DAMAGES

Berger Kahn
*A Law Corporation*

obligation to indemnify Ross for common area accidents, even where those accidents were caused by distracted driving rather than speeding (as was the case in *Bernal*).

33.  Because it was exclusively focused on trying to save something off of its $10,000,000 policy limit, Allied World disregarded the damage its strategy did to the ability to defend the case.  To blame Ross, La Habra would have to embrace the false theory that the shopping center was a dangerous place for pedestrians, and shift the focus away from the fact that Figueroa's attention was concentrated on her radio when she drove into Bernal.  In other words, Allied World was playing right into the hands of Bernal and her attorneys.

34.  Allied World's new theory of liability—treating the shopping center as dangerous for pedestrians while trying to blame Ross for that perceived danger because it had allegedly failed to report speeding drivers—came as a complete surprise to La Habra's other insurers, who were first informed of it on or around November 12, 2025.  It meant that the simple and potentially very convincing defense of merely pointing to the video of the driver who hit Ms. Bernal while apparently looking at her radio rather than what was in front of her could no longer be the sole focal point.  It was also legally wrong, factually misguided, and staggeringly risky.

35.  Allied World's new strategy was not only the opposite of La Habra's defense strategy up to that point, but it would also shift the jury's focus from the distracted driver to the allegedly dangerous shopping center conditions.  It also minimized the defense's strongest evidence: the video that appeared to show the driver who hit Bernal looking at her radio immediately before the accident happened.

36.  The strategy was legally wrong because the lease only required Ross to report the incident for which it wanted La Habra's indemnification, not all perceived dangerous conditions ever present within the shopping center.  And,

10

COMPLAINT FOR DAMAGES

contrary to Allied World's assumption, La Habra did not need to blame Ross at trial as a precondition for recouping from Ross any award made against La Habra at trial. If the jury had blamed La Habra, and if La Habra had a right to indemnity from Ross under the lease, La Habra could have sued Ross for indemnity after it paid Bernal (i.e., after trial had concluded).

37.    Allied World made its decision to switch gears unilaterally, less than one week before trial, without consulting any of the other carriers in the tower, and without obtaining their consent. Allied World acted unilaterally, and over La Habra's objection. Allied World was so focused on trying to save itself money, that it entirely disregarded the interests of its insureds and the upper-level insurers in the tower.

38.    Allied World then announced that it had conflicted out and dismissed La Habra's trial counsel, Alex Giannetto of Bremer Whyte Brown & O'Meara, due to the firm's joint representation of La Habra and Ross. This "conflict" was based on Allied World's insistence that Ross, now a nonparty to the case, would need to appear on the verdict form in order for La Habra to recover from Ross. As Allied World saw it, to ensure that a jury could assign fault to Ross, La Habra's trial counsel would need to belatedly cross-complain against Ross to get Ross on the verdict form.

39.    Given that Allied World's new view of the case conflicted-out trial counsel, Allied World announced that it had unilaterally selected and appointed new counsel, and would bet everything on the trial judge granting a continuance of the trial based on new counsel's obvious and dire need to prepare for trial. But the trial judge had previously indicated that no extension requests would be granted.

### Reaction to Allied World's "Hijacking" of the Defense

40.    After the November 12 phone call, and the November 13 follow up email, the remaining carriers were shocked and alarmed by Allied World's unilateral takeover of the defense and its new position, almost immediately

COMPLAINT FOR DAMAGES

Berger Kahn
*A Law Corporation*

Berger Kahn
*A Law Corporation*

describing it as dangerous and counter-productive, and an "incredibly risky strategy" that "dropped a bomb on the defense right before trial."

41. On November 13, Tokio Marine's attorneys wrote to David Hackett, Allied World's attorney, asking Allied World to at least offer $4,000,000 of its limits to re-open settlement discussions with plaintiff.

42. On November 13 with La Habra's new trial counsel, Charles Meyers, formally substituted into the case as La Habra's new defense counsel, the trial judge in the *Bernal* case, very predictably (at least it was very predictable to everyone except Allied World) vacated the motion to continue trial. As the court had previously stated, there would be no trial continuance. The strategy of unilaterally hijacking and dropping a bomb on the defense to try to save money had blown up before Allied World could get the bomb out of its hands.

43. On November 13, with its strategy having failed so horribly, Allied World first offered money toward settlement. But by then, its $1,000,000 offer was pointless.

44. In a November 15, 2025 letter to Allied World, Tokio Marine's attorney described some of Allied World's misconduct, noting that Allied World had "forced a situation where a new attorney will have less than a week to get ready, where the opportunity to depose experts has been lost, and where the plaintiff's attorney now smells blood."

45. Tokio Marine called on Allied World to "mitigate the damage it has caused" and noted that "[h]aving squandered the opportunity to settle at a reasonable amount within its limits, Allied World will ultimately be required to pay every dollar above $16M that is required to settle this case (or satisfy a judgment against La Habra)."

46. Tokio Marine's attorney outlined the disagreement with Allied World's new view of the case that tried to implicate the already dismissed Ross, and its decision to replace trial counsel almost literally at the last minute.

47.     First, Allied World's stated goal of obtaining indemnification from Ross did not require or justify removal of trial counsel.  The theory of liability against Ross was based on Allied World's erroneous interpretation of the lease agreement.  Ross' re-insertion into this case would, at the very least, require the court to add a nonparty to the verdict form.   And in reality, Ross's inclusion in the case was not essential to Allied World's recovery from Ross' insurer, because an indemnification action, if meritorious, could be brought against Ross after a verdict.

48.     Regarding the lease interpretation, Tokio Marine's attorney noted that Allied World's attempt to implicate Ross was legally incorrect because Allied World: "seems to be reading the lease as if Ross's failure to report a potential hazard nullifies La Habra's duty to indemnify Ross for injuries that occur in or due to the common areas.  That is not what the quoted part of the lease says.  The lease merely required Ross to report an actual claim or damage to invoke its indemnification right."

49.     Regarding the likelihood of putting Ross on the verdict form, Tokio Marine's attorney noted that the inclusion of a dismissed defendant on a verdict form required "substantial evidence that [the] nonparty is at fault before damages can be apportioned to that nonparty," citing *Scott v C.R. Bard, Inc.*, 231 Cal.App.4th 763, 785 (2014).  Tokio Marine's attorney questioned whether and how Allied World would be able to meet this burden of showing substantial evidence of fault that would be needed to include a non-party on the verdict form?"

50.     Tokio Marine's attorney noted that Allied World "jumped the gun" in asserting it must include Ross on the verdict form or lose its indemnity claim.  Pertinent case law was highlighted to show that a claim for express or implied indemnity would not accrue until Allied World suffered actual loss through payment.

51.     Because the indemnity claims would not accrue until after a verdict imposed liability on La Habra, there was no need to sue Ross, and no need to list

COMPLAINT FOR DAMAGES

Ross on a verdict form. Tokio Marine's attorney warned that Allied World's plan to pull Ross back into the case offered no substantive benefit to in terms of defending against liability. It also worked to La Habra's and the other insurer's detriment.

52. Tokio Marine's attorney explained that "No one other than Ms. Freilich saw any benefit in trying to get Ross into the case." Blaming Ross based on its knowledge of prior speeding incidents, if successful, would divert plaintiffs attention from the obvious liability of the distracted driver and redirect it toward the shopping center conditions: a theory of liability that implicated La Habra.

53. Tokio Marine's attorney pointed to the fact that Bernal's injuries did not involve an accident caused by speeding, but by driver inattention: "Aiming at Ross and blaming speeding would merely shine a spotlight on the condition of the shopping center."

54. Finally recognizing that the extreme gamble it had taken to try to avoid paying toward a settlement had been an epic fail, on Saturday, November 15, 2025, Allied world offered the $9,000,000 that had remained on its policy limit, all to no avail. And then Allied World immediately called on Tokio Marine to try to clean up the mess it had made.

### First Cause of Action Against Allied World and DOES 1-5
### (Equitable Subrogation)

55. Plaintiff Tokio Marine reasserts and realleges paragraphs 1 through 54 of this complaint as though repeated verbatim at this point in the complaint.

56. Tokio Marine suffered a loss for which Allied World is liable due to Allied World's acts or omissions in failing to reasonably settle the *Bernal* case, and for its interference with La Habra's ability to defend the *Bernal* case, all of which inflated the price of settlement by many millions of dollars.

57. As an excess insurer with a policy that attached only after Allied World's policy exhausted, Tokio Marine was not primarily liable for this loss. Tokio Marine has compensated La Habra by paying out an excess amount (over

COMPLAINT FOR DAMAGES

and above the actual settlement value but for Allied World's misconduct) to settle the *Bernal* case within Tokio Marine's policy limits, in whole or in part, for the same loss for which Allied World is primarily liable.

58.    Tokio Marine has paid La Habra's claim in the *Bernal* case to protect La Habra from the large verdict that would have ensured due to Allied World's failure to reasonably negotiate settlement and its forcing a change of defense counsel the week of trial.

59.    La Habra has an existing, assignable cause of action against Allied World, which La Habra could have asserted for its own benefit had it not been compensated for its loss by Tokio Marine.  And La Habra has assigned its rights to Tokio Marine.

60.    Tokio Marine has suffered damages caused by Allied World's acts and/or omissions.

61.    Justice requires that the loss be entirely (or at least partially) shifted from Tokio Marine to Allied World.

62.    Tokio Marine's damages are the $10,000,000 it paid to settle a case that should have settled within Allied World's policy limits, and at least $6,000,000, which represents the minimum excess amount Tokio Marine paid to settle La Habra out of the *Bernal* case over and above the settlement amount that would have been achieved if Allied World had acted reasonably.

### Second Cause of Action Against Allied World and DOES 1-5
### (Bad Faith Refusal to Settle)

63.    Plaintiff Tokio Marine reasserts and realleges paragraphs 1 through 62 of this complaint as though repeated verbatim at this point in the complaint.

64.    La Habra and Allied World, and the entire tower referenced in paragraph 9, entered into a contract to insure La Habra against personal injury liabilities, including the liability alleged in the *Bernal* case.

COMPLAINT FOR DAMAGES

Berger Kahn
*A Law Corporation*

65. California law imposes a duty of utmost good faith and fair dealing on liability insurers who have an opportunity to settle lawsuits against insureds.

66. Allied World unreasonably, in bad faith, and maliciously interfered with La Habra's right to receive the benefits of the contract by failing to timely negotiate and failing to timely offer its policy limits toward settlement of the *Bernal* case. If Allied World had acted reasonably and in good faith, the case would have settled in October or early November for $16,000,000 to $20,000,000.

67. Allied World acted in bad faith, and maliciously interfered with La Habra's right to receive the benefits of the contract by forcing experienced, qualified and prepared trial counsel off the case in the days before trial was to start.

68. Acting as if it was the one practicing law, Allied World acted in bad faith, and maliciously interfered with La Habra's right to receive the benefits of the contract by insisting on a defense strategy that would shift attention away for the simple unified defense based on the video showing the driver's inattentiveness, in an effort to blame Ross for what Allied World wanted to argue was the unsafe condition of the shopping center.

63. La Habra and Tokio Marine were harmed by Allied World's conduct, La Habra incurred legal fees and, to protect La Habra, Tokio Marine had to pay amounts over and above Allied World's policy limits and in excess of a reasonable settlement value ($6 to $10 million). La Habra and Tokio Marine have incurred and will incur legal fees and expenses to compel Allied World to pay the amounts it became legally obligated to pay when its impairment of the defense, refusal to promptly settle, and risky trial strategy caused the ultimate Bernal settlement to be at least $6,000,000 more than it would have been if Allied World had acted reasonably and in good faith. Such legal fees and expenses are recoverable as damages under *Brandt v. Superior Court*, 37 Cal.3d 813 (1985).

Berger Kahn
*A Law Corporation*

COMPLAINT FOR DAMAGES

64.    Under principles of equitable subrogation and as an assignee, Tokio Marine stands in the shoes of La Habra, holds La Habra's rights, and properly pursues this cause of action against Allied World.

### Third Cause of Action Against Allied World and DOES 1-5
### (Bad Faith Interference With Defense)

65.    Plaintiff Tokio Marine reasserts and realleges paragraphs 1through 64 of this complaint as though repeated verbatim at this point in the complaint.

66.    La Habra and Allied World, and the entire tower referenced in paragraph 9, entered into a contract to insure the La Habra Marketplace Property against personal injury liabilities, including the liability alleged in the *Bernal* case.

67.    California law imposes a duty of good faith and reasonableness on liability insurers who are involved in handling and defending third party lawsuits against insureds.

68.    Allied World wrongfully, unfairly and improperly interfered with La Habra's ability to successfully defend the *Bernal* case.  Allied World took control of the defense two weeks before trial, concocted a conflict of interest that caused the removal and replacement of defense counsel less than one week before the start of trial, and bet everything on this tactic's ability to secure a trial continuance.

69.    When the court rejected the continuance, Allied World folded, finally offered its $10,000,000 policy limit toward settlement, and called on Tokio Marine to clean up the mess it had just made.

70.    La Habra and Tokio Marine were harmed by Allied World's conduct. Among other things, La Habra incurred legal fees and, to protect itself after Allied World's bad faith conduct left it suddenly defenseless (for all practical purposes). Tokio Marine had to pay amounts over and above Allied World's policy limits and in excess of a reasonable settlement value.  La Habra and Tokio Marine incurred other consequential losses, to be proven at trial.  And the legal fees and expenses

17
COMPLAINT FOR DAMAGES

Berger Kahn
*A Law Corporation*

being incurred to compel Allied World to pay wrongfully withheld benefits are further damages to be proven and recovered.

### Fourth Cause of Action Against Allied World and DOES 1-5

### (Bad Faith Loss of and Interference with Settlement Opportunity)

71.    Plaintiff Tokio Marine reasserts and realleges paragraphs 1 through 70 of this complaint as though repeated verbatim at this point in the complaint.

72.    La Habra and Allied World, and the entire tower referenced in paragraph 9, entered into a contract to insure La Habra against personal injury liabilities, including the liability alleged in the *Bernal* case.

73.    California law imposes a duty of utmost good faith and reasonableness on liability insurers who have an opportunity to settle lawsuits against insureds.

74.    Allied World wrongfully and unfairly interfered with La Habra's right to receive the benefits of the contract by failing to timely negotiate and failing to timely offer its policy limits toward settlement of the *Bernal* case.  Allied World concentrated its efforts solely on promoting its own interest in avoiding or minimizing the payment it might have to make, while ignoring La Habra's interests and the interests of the other insurers that comprised the tower of coverage available to La Habra, in settling the *Bernal* case.

75.     Allied World decided on a risky strategy that was designed to allow Allied to gamble with money belonging to the other insurers that comprised the tower.

76.    La Habra and Tokio Marine were harmed by Allied World's conduct. Among other things, La Habra incurred legal fees and, to protect itself after Allied World's bad faith conduct left it suddenly defenseless (for all practical purposes). Tokio Marine had to pay amounts over and above Allied World's policy limits and in excess of a reasonable settlement value.  La Habra and Tokio Marine incurred other consequential losses, to be proven at trial.  And the legal fees and expenses

18

COMPLAINT FOR DAMAGES

being incurred to compel Allied World to pay wrongfully withheld benefits are further damages to be proven and recovered.

**Fifth Cause of Action Against Allied World and DOES 1-5**

**(Intentional Interference with Contract)**

77.    Tokio Marine reasserts and realleges paragraphs 1 through 76 of this complaint as though repeated verbatim at this point in the complaint.

78.    Tokio Marine and La Habra were parties to a valid contract in the form of an insurance agreement.  The insurance contract was part of a tower of liability insurance coverage, as outlined in paragraph 9.

79.    Allied World had knowledge of the insurance contract between Tokio Marine and La Habra due to Allied World's and Tokio Marine's involvement as two of La Habra's insurers during the pendency of the *Bernal* litigation.

80.    Allied World engaged in (1) intentional acts designed to induce a breach and/or disrupt the contractual relationship between Tokio Marine and La Habra, and/or (2) acts that were substantially certain to result in the breach of, or disruption in, the contractual relationship between Tokio Marine and La Habra.

81.    Allied World actually disrupted the contractual relationship between Tokio Marine and La Habra, through its actions as described in this complaint that impaired La Habra and Tokio Marine's ability to effectively defend the *Bernal* case.  Allied World acted with malice, demonstrating conscious disregard of the rights of others, while solely focused on a narrow-minded desire to desperately try to save something off its policy limits.

82.    As a result of Allied World's actions, Tokio Marine was damaged in the amount of at least $6,000,000, and up to $10,000,000, representing the amount of the settlement payment over and above the far lower settlement amount that would have been achieved if Allied World had not conducted itself reasonably and not interfered with the La Habra's defense and the settlement efforts that were being undertaken, as set forth in this complaint.

19

COMPLAINT FOR DAMAGES

**Sixth Cause of Action Against Allied World and DOES 1-5**

**(Interference with Prospective Economic Advantage)**

83.     Tokio Marine reasserts and realleges paragraphs 1 through 82 of this complaint as though repeated verbatim at this point in the complaint.

84.     An economic relationship existed between La Habra, Tokio Marine, and the other tower carriers, which contained the probability of future economic benefit to Tokio Marine, in terms of avoiding significant financial loss if an effective defense to the *Bernal* case was mounted.

85.     Allied World knew about the existence of the economic relationship between Tokio Marine, La Habra, and the tower of insurers. Allied World knew Tokio Marine was relying on the tower carriers below it to mount an effective defense against the *Bernal* case.

86.     Allied World engaged in (1) intentionally wrongful acts designed to disrupt the prospective the relationship by eliminating or significantly impairing the ability for La Habra to effectively defend the Bernal case.   Allied World acted with malice or, at the very least, negligently impaired the ability to defend and unilaterally imposed substantial risks on Tokio Marine and the Tower insurers by seizing control of the defense, disqualifying the only attorney who was prepared to try the Bernal case, and then betting everything on the trial court granting an extension the trial court had already indicated it would not grant.

87.     Allied World's wrongful acts actually disrupted the prospective relationship, and caused a substantial financial loss to Tokio Marine that would not have been incurred in the absence of Allied World's misconduct.  Allied World actually interfered with Tokio Marine and La Habra, through its actions as described in this complaint that impaired La Habra and Tokio Marine's ability to effectively defend the *Bernal* case.  Allied World acted with malice, demonstrating conscious disregard of the rights of others, while solely focused on a narrow-minded desire to desperately try to save something off its policy limits.

Berger Kahn
*A Law Corporation*

20

COMPLAINT FOR DAMAGES

88.     As a result of Allied World's actions, Tokio Marine has been damaged in the amount of $6,000,000 to $10,000,000 in overpaid settlement funds, plus other consequential and related damages.

### PRAYER FOR RELIEF

Tokio Marine respectfully requests that this Court enter judgment against Defendants as follows:

1.     Compensatory damages in the amount of at least Six Million Dollars ($6,000,000) to Ten Million Dollars ($10,000,000), representing the amount of the excess payout by Tokio Marine, over and above the amount the *Bernal* case would have settled at in the absence of Allied World's misconduct; legals fees and expenses incurred due to Allied World's hijacking of the defense; Attorney's fees and costs incurred to compel payment of wrongfully withheld benefits; and other consequential damages, to be proven at trial.

2.     Attorney's fees and costs under *Brandt*;

3.     Prejudgment interest;

4.     Punitive damages; and

5.     Any such other and further relief as this Court may deem just.


DATED:  June 5, 2026                    BERGER KAHN, A Law Corporation


By:_____
       David B. Ezra, Esq.
       Steven A. Ehrlich, Esq.
       Craig Kline, Esq.
       Heather Whitmore, Esq
       Attorneys for Plaintiff
       Tokio Marine Specialty Insurance
       Company

Berger Kahn
*A Law Corporation*

21
COMPLAINT FOR DAMAGES